UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. _____

JANNINE ELLIS,
        Plaintiff

v.

BRIAN ARRIGO, Individually and as
Mayor for City of Revere; CITY OF
REVERE
        Defendants

## **COMPLAINT AND JURY DEMAND**

### Introduction

This is a civil rights action brought under 42 U.S.C. § 1983 against the City of Revere

and its Mayor Brian Arrigo.  Under color of law, the defendants penalized, harassed and

terminated Jannine Ellis for exercising her constitutionally-secured rights of free speech and

association.  Defendants also published untrue statements to third parties regarding plaintiff and

intentionally inflicted emotional distress on plaintiff through their conduct.  As a direct and

proximate result of defendants' actionable conduct, plaintiff suffered and continues to suffer

damages.

### The Parties

1.      Plaintiff Jannine Ellis, (hereinafter "Plaintiff") is a citizen of the United States of

America.  At all relevant times, Plaintiff has resided in the City of Revere, Massachusetts and

was a "public employee" for the City of Revere, Massachusetts, for purposes of her 42 U.S.C. §

1983 claims.

2.      The Defendant Brian Arrigo ("Arrigo") is a resident of the City of Revere.  Since January

2016, Arrigo has served as the elected Mayor for the City of Revere, a municipality located

within the Commonwealth of Massachusetts located at 281 Broadway, Revere, MA 02151.

Arrigo is sued individually and in his official capacity.

3.      The Defendant, City of Revere is a municipality organized within the Commonwealth of

Massachusetts.  The municipal offices of the City of Revere are located at 281 Broadway,

Revere, MA 02151.

## Jurisdiction and Venue

4.      This action is brought pursuant to 42 USC § 1983 and the First and Fourteenth

Amendments of the United States Constitution.

5.      This Court has original jurisdiction over this matter pursuant to 28 U.S. Code § 1331 as it

arises under the United States Constitution and laws of the United States.

6.      Venue in this Court is proper pursuant to 28 U.S. Code § 1391.

## Facts Relevant to all Claims

### *The Massachusetts Attorney General's Office Local Consumer Program*

7.      As part of its services to consumers, the Massachusetts Attorney General's Office (AGO)

has established a statewide network of Local Consumer Programs (LCPs) through Local

Consumer Aid Fund ("LCAF") grants. The LCPs provide consumer information, resources and

education. Additionally, the LCPs offer free, voluntary mediation services (generally conducted

over the phone) to consumers who have filed complaints concerning problems they may have

encountered with businesses.

8.      The LCP office in Revere is one of seventeen LCP offices in the Commonwealth. During

all relevant times, the Revere LCP office was designated by the AGO to provide services to the

following geographic areas: Chelsea, East Lynn, Everett, Lynn, Lynnfield, Malden, Marblehead, Melrose, Nahant, Revere, Salem, Saugus, Swampscott, Wakefield and Winthrop.

9.      On July 10, 2000, Plaintiff was hired as Secretary for the Revere LCP with an annual salary of $20,000. The following year, Plaintiff's title became that of Clerk & Typist with an annual salary of $26,022. By 2005, Plaintiff earned an annual salary of $37,909.

10.     As Director of the Revere LCP, the Plaintiff worked closely with the AGO and was responsible for implementing the program's procedures established by the AGO.

11.     At all relevant times and regardless of the title Plaintiff was provided, essentially a one-woman operation and any assistance she received came from two retired, part-time seniors who worked on stipend.

12.     The Plaintiff's salary in 2019 was approximately $53,866, of which, the majority of funds or $29,294[1] was paid from LCAF grants provided by the AGO. In fact, the amount of funds allocated by the City of Revere in their 2019 budget for the entire Revere LCP office amounted to only $49,927 or a mere .024 percent of a $207,092,653 budget. The City employs approximately 450 individuals.

13.     Moreover, Plaintiff was the lowest paid "Department Head" in the City by almost $30,000. The majority of her counterparts in title, made at least $80,000 per year, although some received salaries well over $100,000 per year.

14.     The LCP rarely worked in conjunction with the City of Revere.  Plaintiff's interactions as Director of LCP with the Mayor of Revere and some of the Department Heads were limited to about a dozen occasions per year, when she attended monthly cluster meetings.

---

[1] The 2019 AGO's LCAF grant totaled $52,761. On July 1, 2019, Plaintiff received a congratulatory letter from Attorney General Maura Healey advising her that her office was awarded a grant of $75,000 for the 2020 fiscal year.

15.     At all times, Plaintiff was required by the AGO to relay to that the office was "working in cooperation with the Massachusetts Attorney General's Office" any time reference was made to the Revere LCP office's affiliation with the AGO, whether in writing or verbally.

16.     The Plaintiff was also required by the AGO to identify the AGO as the funding source for the LCP, in any printed or electronic materials.

17.     A Program Coordinator of the AGO's Consumer Advocacy & Response Division, served as the Revere office's point of contact for the AGO grant administration, day-to-day operations and case questions.

18.     While her office was physically located in the City of Revere, Plaintiff was, for all intent and purposes, working under the auspices of the State's AGO's office. For instance, Plaintiff could not close the LCP office for two or more consecutive days without advance written notice to and approval from the AGO. Plaintiff was also required to submit notice of all routine office closings at least fourteen (14) days in advance (i.e., her scheduled vacations, any office holidays, events, planned outreach and/or trainings); and in the event of an unanticipated or emergency office closing (i.e., storm closure or unforeseen illness), Plaintiff was required to notify the AGO's Program Coordinator.

19.     The AGO required Plaintiff to attend the regularly scheduled in-person meetings and/or telephone conference calls as mandated and organized by the AGO.

20.     The AGO required Plaintiff to accept for its service area, consumer advocacy referrals from the AGO and complaints filed directly with its office regardless of the location of the parties.

21.    The AGO required Plaintiff to import all substantive notes, template letters and correspondence related to a consumer complaint into the online database system established and monitored by the AGO.

22.    The AGO required Plaintiff to organize at least six (6) free education, training or outreach activities within the geographic district each year; and any materials used for said purposes had to be submitted and approved by the AGO two weeks in advance.

23.    The AGO required Plaintiff to refer all inquiries from the press to the AGO's press office, as Plaintiff was prohibited from speaking directly with members of the Press without prior approval from the AGO.

24.    The AGO required Plaintiff to prepare and submit quarterly reports to the AGO.

25.    Plaintiff's interacted with representatives from the various administrations including those from Chelsea, East Lynn, Everett, Lynn, Lynnfield, Malden, Marblehead, Melrose, Nahant, Revere, Salem, Saugus, Swampscott, Wakefield and Winthrop.

26.    Over the course of Plaintiff's almost 20-year employment with the City of Revere, Plaintiff worked under three separate Mayoral Administrations.

27.    Plaintiff performed her duties and responsibilities in an exemplary manner, as evidenced by multiple commendations received from the Massachusetts Attorney General.

28.    Moreover, other than the cluster meetings, the only other occasion that Plaintiff's path crossed with that of the Mayor was at community events she attended with her grandchildren throughout the city.

29.    Even still, discussions at the cluster meetings were centered around upcoming events and programs for the various sectors (i.e., seniors, veterans, parks and recreation) and keeping relevant departments, that maybe affected, apprised of the events. Given the nature of the LCP

and the detachment of the office to the rest of the city, Plaintiff rarely reported anything relevant to the operations of the City of Revere at these cluster meetings. Her contribution consisted of sharing the numbers of complaints her office had opened and closed.

30.     The Massachusetts Attorney General's Office established the technical and professional criteria for implementing the LCP from, *inter alia*, the standards of performance, technology criteria, confidentiality and conflict of interest to the entire advocacy process starting with the initiation of a consumer complaint to the records retention policy.

31.     The Plaintiff position at LCP was not connected to the political concerns of the City nor was her position at LCP one of a policymaker subject to political discharge Plaintiff's responsibilities with respect to the overall operation of the City of Revere were minimal, if at all.

32.     Plaintiff had no influence on the City's position with respect to programs and policy initiatives.

33.     Plaintiff had no authority to formulate City plans to implement any broad goals of the City.

34.     Plaintiff had no authority to speak in the name of or commit on behalf of the actual policymakers of the City.

35.     Plaintiff was not privy to information that would or could be considered the City's confidential information, confidential documents, or other materials that embody policymaking deliberations and determinations.

36.     As Director of the LCP, Plaintiff did not meet with City elected officials or their subordinates and was not involved with them regarding policies or matters that could be considered political.

37.     Moreover, Plaintiff's duties were severely limited by statute, particularly Chapter 93A, and policy determinations made by the Attorney General's Office, a wholly separate and distinct entity from the City of Revere.

*Arrigo Administration*

38.     Plaintiff and her family had been long-time supporters and friends with Daniel Rizzo, who had served on the Revere City Council beginning in 2000, until he was elected Mayor of the City of Revere in 2012.

39.     In 2015, Rizzo ran for re-election. His challenger was Brian Arrigo, a City Councilor, and a Revere native, who grew up in politics.

40.     Plaintiff knew Arrigo and his family. In fact, Plaintiff grew up with Arrigo's mother and had been a neighbor of his grandmother.  Plaintiff and Arrigo had worked together on other political campaigns.

41.     Plaintiff's support for her long-time friend Daniel Rizzo, however, did not waver. Arrigo was well aware of Plaintiff's relationship with Rizzo and knew that the Plaintiff supported and was affiliated with his opponent in the Mayoral race.

42.     Plaintiff "shared" and "liked" Rizzo's social media posts; had a "Rizzo" political sign on her home; volunteered with his committee; attended Rizzo's fundraisers; held political signs during sign-holding events; participated in phone banks; and appeared in pictures along-side Rizzo and/or his committee members. Arrigo was aware of these campaigning activities in support of Rizzo.

43.     On November 3, 2015, Rizzo was defeated by Arrigo in the city-wide Mayoral election.

44.     While the newly elected Mayor's visceral disdain for Rizzo became apparent during the election, it was unexpected that the newly-elected Mayor would carry his contempt through to other political races and to Rizzo's known supporters.

45.     On November 4, 2015, Plaintiff and the newly elected Mayor crossed paths at the American Legion Building located at 249 Broadway in Revere.  During this meeting, Plaintiff congratulated the newly-elected Mayor and said to him, "You know I've been friends with Dan for a long time and while I wasn't with you during the election, you are the Mayor and I'm with you now and look forward to working with you." The newly elected Mayor smirked and walked away.

46.     By the end of January 2016, Rizzo announced that he would throw his hat in the First Suffolk and Middlesex District Senatorial race. Plaintiff outwardly supported Rizzo's candidacy. Plaintiff "shared," "liked" and "loved" Rizzo's social media posts; had a "Rizzo" political sign on her home; volunteered with his committee; attended Rizzo's fundraisers; held political signs during sign-holding events; and appeared in pictures along-side Rizzo and/or his committee members.

47.     The Mayor outwardly opposed Rizzo and supported a candidate from another City.

48.     Plaintiff was also Facebook friends with the Mayor and many members of his inner circle and "liked" and "shared" many of the Mayor's social media posts.

49.     Around this time, Plaintiff noticed that on the rare occasions she found herself in the Mayor's presence, his behavior towards her was always rude, disrespectful, and made to belittle her. For instance, while the Mayor routinely welcomed the seven or so attendees at the start of the cluster meetings, he blatantly ignored Plaintiff. Even when Plaintiff greeted him, he snubbed

her. The Mayor's behavior was meant to be obvious to all who witnessed it and intentionally humiliating to the Plaintiff.

50.     In about March 2016, a number of Rizzo supporters who had worked for many years in the City's Seniors Parks Program, were not called back to the program, including Plaintiff's husband.

51.     On or about September 12, 2016, a public city council meeting was held concerning the private development at the former site of the Shaw's grocery store located in the Beachmont neighborhood of Revere.

52.     The private real estate developers had previously presented the project, a large apartment complex, one-year prior, under the Rizzo administration, and the project had been rejected by the city council. Like many of her neighbors, Plaintiff was a staunch opponent of the proposal. At the time of the initial proposal, the Mayor was then a City Councilor had also been averse to the development and had voted against it.

53.     The same private developers were scheduled to be heard on September 12, 2016, before the City Council with an updated proposal, which was slated to include approximately 195 apartments and 132-room extended-stay hotel. The proposal's sheer size alone, had created a great deal of public concern.

54.     On that same date, September 12, 2016, acting as a private citizen, Plaintiff posted on her personal Facebook page, a statement informing her Beachmont neighbors that the City Council was voting on the Shaw's site project and "if you care about your city prove it…come to the meeting."

55.     Later that evening, Revere citizens who opposed the proposed development, participated in the heavily attended public hearing, including the Plaintiff, whom herself resides in the host

Beachmont neighborhood. Plaintiff took one of the few remaining vacant seats located in the front row of the council chambers. The Plaintiff openly expressed her disapproval of the project by listening, supporting, nodding her head in acquiescence, applauding and clapping her hands, in response to those individuals who spoke in opposition.

56.     Following the public hearing, Plaintiff took to her personal Facebook page to express her discontent for what she heard at the public hearing, posting, "What a farce!! Why did I waste my time?"  The following morning, September 13, 2016, a colleague of the Plaintiff and close friend to the Mayor, Raymond Nickerson, approached the Plaintiff in her office, He interrupted a conversation she was having with a colleague, Marie Lepore, to say to Plaintiff, "Whoa, everyone is talking about you up the Mayor's office! He wants to fire you and they're all saying he should!"

57.     Plaintiff inquired, "Fire me, for what?" Mr. Nickerson responded, "You went to the meeting last night and were against it and you rolled your eyes." Plaintiff replied, "I live right there, I have the right to feel what I want about it. It's in my neighborhood. I don't want it."  Mr. Nickerson warned the Plaintiff that the Mayor was mad, and that Plaintiff should expect to be called up to the Mayor's office.

58.     The Mayor did not call Plaintiff to his office. Instead, on or about September 15, 2016, the Mayor visited the Plaintiff unannounced at her office on Beach Street, and while in the presence of the two part-time employees, Marie Lepore and Virginia Pinabell, the Mayor expressed his disappointment with the Plaintiff because of her participation at the public hearing days before.

59.     The Plaintiff assured the Mayor that her opposition to the private developers was not personal to him. She assured the Mayor that she liked him and respected his office. Plaintiff

reminded the Mayor that she lived in the Beachmont neighborhood; that she would be directly and adversely affected by the development; that she had been against the project from the beginning, just as he once was; and that she believed that the site could have been put to better use.

60.     During the September 15, 2016 conversation with the Mayor, the Plaintiff offered that if she had rolled her eyes, it was simply a reaction to what she was hearing about the proposed development. The Mayor responded, "I don't see you rolling your eyes at Dan's [Rizzo] meetings." Plaintiff stated that she did not attend Dan's meetings or any other meetings, but that this issue was "close to home, literally." Again, the Plaintiff reassured the Mayor that she liked him. The Mayor responded, "Oh you like me, but you love Dan," to which, the Plaintiff was uncertain as how to respond. She understood the Mayor's comment to be a reference to her personal Facebook activity, "likes" versus "love" emoticon, in support of Rizzo.

61.     A cluster meeting was scheduled for the morning of November 30, 2016. The Mayor's Assistant customarily sent reminder notices on the morning of the meeting to each of the attendees. Plaintiff did not receive a reminder notice that morning, however, of greater importance is the fact that a pipe had burst in Plaintiff's office building causing flooding, chaos, and disruption. While most employees and members of the public ultimately evacuated the premises, Plaintiff had stayed behind. As a result of that morning's commotion, Plaintiff simply forgot to attend the cluster meeting. In her almost twenty-years of service, Plaintiff had never missed a meeting.

62.     At about 4:00pm on November 30, 2016, via email, the Mayor issued Plaintiff a formal "Written Letter of Reprimand," a severe admonishment for the minor infraction of missing a cluster meeting.

63.     The Mayor's written reprimand was excessively harsh and further evidence of his disparate treatment towards the Plaintiff, as there were other department heads who had repeatedly missed cluster meetings and were never subjected to a "Written Letter of Reprimand."

64.     The Mayor did not consult with Human Resources and his actions were inconsistent with the City's policy of progressive discipline which provides for the administration of oral reprimands prior to written reprimands.

65.     The Plaintiff received the Mayor's email when she appeared for work the next day, she responded apologetically to the Mayor and explained to him all that had transpired the day before. The Mayor did not reply to Plaintiff.

66.     However, the Mayor did not cause the disciplinary letter to be placed in Plaintiff's file nor did the Mayor discuss the matter with Human Resources.

67.     In December 2016, Plaintiff attended the City Hall Employees Christmas Party at the Point of Pines Yacht Club. Shortly after she had arrived, she was approached by the Director of Veteran's Affairs, who asked her "Why do you hate us?" The Director of Veteran's Affairs was referring to the Mayor and members of his inner circle. Plaintiff responded, "Hate who? I don't hate you. You have to understand, Dan is a long-time friend."

68.     A short time later, Plaintiff joined other partygoers on the dance floor. While dancing, the then-Chief of Police pointed at the Plaintiff and yelled out, "There she is…. She isn't with us!" As the Chief made his way to Plaintiff, he continued yelling, "You better be with us! You know I always liked you…I put in a good word for you…You had just better be with us." The Chief continued, "You're safe, for now!"

69.     The Plaintiff turned to the Mayor, who observed the then-Chief of Police's aggressive behavior from no more than a few feet away, to put an end to the torment. However, the Mayor

simply smiled as he watched the Chief continue to harass the Plaintiff. At no time did the Mayor intervene.

70.     The Chief then began yelling at Plaintiff about her colleague, Raymond Nickerson. Amongst the statements he made, he was calling Nickerson a "double agent" and stating, "He's gone! He's gone after the first of the year!" Again, even though the Mayor witnessed the interaction, he took no steps to stop it.

71.     At some point, the Chief's wife appeared and instructed her husband to "leave her alone!"

72.     Plaintiff attempted to make her way off the dance floor, but the Chief pulled her by her hands yelling, "Come on…dance with the Mayor!" He repeated, "Dance with the Mayor, dance with the Mayor…Come on, come on!" The Chief then pushed the Plaintiff into the Mayor for her to dance with him. The Mayor appeared amused by the Chief's antics as he watched on agreeably. The Mayor certainly took no action to stop it.  Plaintiff was mortified and visibly upset by the entire ordeal. She promptly left the dance floor, retrieved her purse and coat and left the event. Plaintiff did not attend another city Christmas party, an event she looked forward to each year, following this incident.

73.     Another incident occurred in the Spring 2017. The Plaintiff and her colleagues had been conversing jovially as they waited for the Mayor, before they began their cluster meeting. As the Mayor approached the group, Plaintiff jokingly said with a smile, "You're late." The Mayor responded by pointing his finger in Plaintiff's face and loudly berating the Plaintiff, "Remember, you are on my time!" The group fell silent. The Mayor's unexpected outburst and abrasiveness towards Plaintiff caused obvious discomfort and awkwardness in what was a cheerful and good-humored moment.

74.    Around the same time, Rizzo announced his candidacy for Councilor-At-Large. Plaintiff

outwardly supported Rizzo. Plaintiff "shared" and "liked" Rizzo's social media posts; had a

"Rizzo" political sign on her home; volunteered with his committee; attended Rizzo's

fundraisers; held political signs during sign-holding events; participated in phone banks and

appeared in pictures along-side Rizzo and/or his committee members. Rizzo topped the ticket in

that election.

75.    On or about September 9, 2017, Plaintiff attended a family festival at her parish, the

Immaculate Conception Church on Beach Street in Revere. While having her picture taken in

front the Mother Mary statue with Father Daniel Laso Pujada, the Plaintiff noticed the Mayor

nearby. Plaintiff called out to the Mayor and motioned with her hands for him to join them, so

that Father Daniel could have his picture taken with the Mayor. As the Plaintiff began changing

positions with the Mayor, the Mayor leaned into the Plaintiff's ear and said to her, "What? You

don't want to take a [expletive] picture with me!?"  Astonished, the Plaintiff reassured the

Mayor, "Oh no, no…it's not that at all. I already had my picture taken with Father Daniel, I

thought you'd want a picture with him."

76.    On March 14, 2018, Plaintiff received a call from John Cimino, the local union[2]

representative advising her that "the Mayor is trying to take your position out of the union…did

you do something to him?" Plaintiff responded, "No…but he knows I wasn't with him in the last

election and it has been torture ever since." Cimino responded, "You better call him because he

wants to get you out of the union."

77.    That same day, on March 14, 2018, Plaintiff emailed the Mayor. She questioned the

Mayor as to why he would remove her position from the union and deprive her of the rights and

---

[2] Plaintiff was a member of Public Employees Local Union 22 of the Laborers' International Union of North
America, AFL-CIO.

protections it afforded. Plaintiff expressed to the Mayor, "I can't help believe that it's because I was not 'with you,' during your campaign," reiterating words he had once spoken to her.

78.     Plaintiff further explained, "I didn't support Tom Ambrosino either, but was never made to feel a target. I work for the city. When the election is over, whomever becomes mayor, becomes my boss and I have always respected that process. I have shown nothing but the upmost respect for you in that office. I've never spoken ill of you. I am a loyal worker and have performed by duties competently and well beyond expectations for over 18 years…. There is no benefit nor reason in allowing my position to become non-union, except to provide less protection for me. The writing is on the wall. I am being retaliated against for having supported the other candidate."

79.     All of the aforementioned actions taken by the Mayor against the Plaintiff, were meant to deter her and other City employees from engaging in constitutionally protected activities.

80.     In her March 14, 2018 email to the Mayor, the Plaintiff reminded the Mayor how she had been unfairly reprimanded and how she was "harassed and bullied" at the Christmas party. Plaintiff wrote to the Mayor, "the message was clear, it was 'very important' that you have my support in the next election." She pleaded with the Mayor, "I have never been made to feel such intimidation, I just want it to stop."

81.     The Mayor did not respond to Plaintiff's March 14, 2018, email.

82.     That same day, Plaintiff met with John Cimino in a small room in the back of the Building Department. Cimino reported to the Plaintiff, "Well, you're okay for now?" Plaintiff asked Cimino, "Why doesn't he leave me alone? Is this going to continue?" Cimino responded, "Can I ask you, how old are you, anyway? How much longer are you going to work?" Plaintiff responded, "Forever."

83.     Plaintiff met with the fairly new Human Resource Director, John Viarella, on the afternoon of March 15, 2018, at his request.

84.     Plaintiff expressed to Viarella that the Mayor's maltreatment of her was motivated by the fact that she had not supported him, and that she supported his opponent in the mayoral election. Plaintiff disclosed to Viarella that she had been afraid to speak about the Mayor's conduct towards her. Viarella shared with Plaintiff that he too was "feeling the political pressure" by the Arrigo administration.  Plaintiff believed she could speak candidly to Viarella and proceeded to tell him about the various incidents involving the Mayor and his inner circle. Plaintiff complained to Viarella that she had been experiencing an increasing political pressure and had felt targeted by the Mayor. Viarella was not surprised by what he was hearing. In fact, he often nodded in agreement as Plaintiff spoke, verbally expressed acquiescence at various times, and specifically commented on the Director of Veterans Affairs' "brashness" and the then-Police Chief's "loud and outspoken" personas.

85.     Plaintiff told Viarella that the Mayor had been relentless in his disparaging treatment of her since he came into office and while providing Viarella with examples, she mentioned the Mayor's severe response in issuing her a written reprimand for having inadvertently missed a meeting, a first in over 16 years of service.

86.     Plaintiff reiterated to Viarella that she wanted the "constant political interference" to stop.

87.     Viaralla was completely unaware of the incident involving the missed meeting or that the Mayor had issued Plaintiff a formal written reprimand. Viarella advised Plaintiff that if she had been written up, a copy of the reprimand would have been placed in her file. Viarella opened what was purportedly Plaintiff's employment file and noted that no such letter of reprimand

existed. He asked Plaintiff if she still had a copy of the reprimand and requested that she forward it to him when she returned to her office, which Plaintiff did.

88.     On or about April 11, 2018, Plaintiff attended Rizzo's annual "St. Patrick's Day" fundraiser, as she had in many years' past. The Mayor in a fleeting appearance, ran into Plaintiff, who jokingly albeit nervously said, "I'm caught" to which the Mayor did not respond, an awkward silent moment followed before the Mayor left.

89.     On or about January 9, 2019, Plaintiff received a personal letter from the Massachusetts Attorney General, Maura Healy, thanking Plaintiff for her "leadership and hard work" over the last year.

90.      On or about April 4, 2019, Rizzo announced that he was running for Mayor for the City of Revere.

91.     Throughout the Mayor's term, Plaintiff had been approached on several different occasions by various individuals close to the Mayor, including Mr. Nickerson, warning Plaintiff that the Mayor was going to "get rid" of her because of her support for the Mayor's opponent. These threats ramped up during the Mayor's re-election campaign that began in the Spring of 2019.

92.     On or about June 7, 2019, Plaintiff reviewed State Ethics Commission Advisory 11-1: Public Employee Political Activity and spoke with Michael McDonald, the attorney-of-the-day at the Massachusetts State Ethics Commission for additional guidance and clarification with respect to permissible political activities.

93.     On or about July 3, 2019, Plaintiff emailed the Mayor, informing him that the AGO had increased the grant amount by $15,000, reminded him that her salary was not commensurate with

to her counterparts and requested that he increase her salary. The Mayor did not respond to Plaintiff's email nor took any other action to address Plaintiff's request.

94.     Between June 2019 and November 2019, Plaintiff engaged in activities in support of Rizzo's mayoral candidacy by "sharing," "liking" and "loving" Rizzo's social media posts; sign holding; phone banking; volunteering with his committee; and attending Rizzo's fundraisers and events.

95.     Without fail, after each event, Plaintiff was approached by members of the Mayor's inner circle, including Mr. Nickerson, who routinely informed Plaintiff that the Mayor was aware of her campaigning activities and advised her to stop, as she was "pissing him [the Mayor] off."

96.     In August 2019, Plaintiff allowed the Rizzo committee to place a political sign in front of her home.

97.     In the days preceding the Mayor's "Sunset Cruise" fundraiser of August 22, 2019, Plaintiff was approached in her office by Ray Nickerson and his wife who urged Plaintiff to attend the Mayor's event. The Nickersons' offered Plaintiff a ticket and advised her that "it would be good for you to show your face." Plaintiff politely declined.

98.     In August 2019, Ray Nickerson approached Plaintiff and informed her about a conversation he had with the Mayor's sister-in-law about Plaintiff, during which, the topic of Plaintiff's termination was discussed. According to Mr. Nickerson, he defended Plaintiff and told the Mayor's sister-in-law that Plaintiff "does nothing wrong," was a "good worker" and "she's always here" and "does a good job." The Mayor's sister-in-law responded, "Well, she missed a meeting." Mr. Nickerson then warned Plaintiff to "cut it out."

99.     On or about September 6, 2019, Plaintiff attended a Rizzo fundraiser. Pictures of the event were posted on various social media outlets and in the local papers, including pictures capturing the Plaintiff at these events.

100.    At all times herein mentioned, and in all matters complained of herein, the defendants acted in full knowledge that they were violating the rights of Plaintiff as protected under the Constitution and the Laws of the United States.

101.    The Plaintiff's employment was subject to the union contract (Agreement) and the Employee Manual ("Manual"), that had been promulgated and disseminated by the City, setting out the terms and conditions of employment, "applicable to all City employees."

102.    Article III, Rights of Management, Section 1, of the Agreement reads, in pertinent part,

> "In the interpretation and administration of this Agreement, the City shat [sic] not deemed to have been limited in any way in the exercise of the regular and customary functions of municipal management or governmental authority and shall be deemed to have retained and reserved unto itself all the powers, authority and prerogatives of municipal management or government authority…" The City of Revere and its management officials have the right to promulgate reasonable rules and regulations pertaining to the employees covered by this Agreement, so long as such rules and regulations do not conflict with any term or condition of this Agreement."

103.    Aside from a single provision in Article III, Section 2, which states, "No bargaining unit employee shall be demoted or suspended except for just cause," the union Agreement is silent with respect to, *inter alia*, termination. The Employee Manual, however, provides a comprehensive process by which terminations will be handled by the City.

104.    First, the Employee Manual, purports that its "purpose of which "is to ensure that employees meet the City's legitimate expectations in the areas of performance and behavior; employees whose performance or behavior is deficient are provided with the necessary

assistance and motivation to meet the City's expectation; and disciplinary action initiated against an employee is fair, consistent and appropriate."

105.    The Employee Manual reflected the City's development of a complete and centralized approach to discipline through the Human Resources Department. The Manual contains provision governing benefits, protections, conditions of employment and include obligations for both the employer and employee. Each of the outlined mandatory polices included in the Employee Manual include a provision advising that the policies apply to all employees unless otherwise addressed in the collective bargaining agreements.

106.    All employees are "responsible to be familiar with and adhere to the provisions and policies contained" in the Employee Manual.

107.    In addition to the union Agreement, the Manual represents the most reliable statement of the terms of their employment.

108.    The Plaintiff reviewed the polices and benefits established by the City in the Manual and executed the required, "acknowledgement of receipt and understanding" that appeared on the second page. She returned the acknowledgement in due course to the Human Resources Department.  Plaintiff understood from the document that a copy of her signed acknowledgement would be placed in her personnel file.

109.    In addition to the various protections and benefits detailed in the Manual, Plaintiff also understood that she could not be fired capriciously and that there was a limitation on its right to terminate her employment, only after the City went through the various detailed procedures set forth in the manual, steps designed to rehabilitate her as an employee in order to avoid termination. Based on the representations made by the City in their Manual, employment would

continue so long as certain conditions that had been thoroughly addressed in the handbook were met.

110.    The City had clearly established and outlined protections that were not necessarily spelled out previously, including a comprehensive progressive discipline policy, whereby the City made a commitment to its employees that they would be protected against arbitrary termination.

111.    The City's progressive discipline policy, in its entirety, reads as follows:

**"PERFORMANCE MANAGEMENT AND DISCIPLINARY PROCEDURES**

**APPLICABILITY** This policy applies to all City employees. Employees subject to the Massachusetts Civil Service Laws and/or collective bargaining agreements are subject to the provisions in this policy that do not conflict with Civil Service Laws or collective bargaining agreements.

**PURPOSE AND SCOPE** The purpose of this policy is to ensure that employees meet the City's legitimate expectations in the areas of performance and behavior; employees whose performance or behavior is deficient are provided with the necessary assistance and motivation to meet the City's expectations; and disciplinary action initiated against an employee is fair, consistent and appropriate.

**POLICY** The City has a policy of progressive discipline; however, the City reserves the right to take whatever disciplinary action is necessary depending on the nature and the severity of the issue. This means that in most instances initial issues related to performance or policy infractions will be addressed verbally by a supervisor. This also means that subsequent disciplinary action will become progressively more severe for continued unsatisfactory performance or successive offenses whether or not they are of the same nature or kind. At each step, the standard should be reiterated, and the employee offered any appropriate and reasonable assistance. The primary goal of each step in the disciplinary process is the correction of the problem. The ultimate step in the disciplinary process is termination of the employee.

**PROCEDURE** Employees must know what is expected of them and the consequences for failing to meet these expectations. In general, the disciplinary process is set up as follows:

• Verbal conversation– Should be initiated by the employee's immediate supervisor. The supervisor should clearly state the nature of the performance issue or policy infraction, its' effect on the City, Department etc. and provide suggestions for improvement. The supervisor should take notes related to the conversation that include the following:

o The date that the conversation took place
o What was said by each party
o Any questions or concerns raised by the employee
o Any action items that were agreed to by either person

The supervisor should follow up with an email or other written note to the employee summarizing the conversation, what was agreed to by either party and the consequences for continued poor performance or policy infractions. The supervisor should also keep notes on any follow up conversations that occur as a result of this issue.

• Written Warning– Should be initiated by the employee's immediate supervisor. This is a formal written document, and the supervisor should request a template from the Human Resources Department. The written document should include the following information: o A record of any prior conversations related to the issue

o A clear and concise description of the performance issue or unacceptable behavior
o A course of action the employee needs to take to address the performance issue or unacceptable behavior
o A time frame by which improvement must be shown
The supervisor should write the first draft of this document and forward it to Human Resources for final review and editing. The document should be presented in a private setting with a member of Human Resources present. Everyone should take notes that include:

- The date that the conversation took place
- What was said by each party
- Any questions or concerns raised by the employee
- Any action items that were agreed to by either person

The employee should be asked to sign the document within three business days. The supervisor should keep notes of all conversations related to this or other issues throughout the duration of the written notice period.

**SUSPENSION AND TERMINATION.** Suspensions should be initiated by the supervisor and approved by Human Resources. Terminations should take place after an employee has failed to perform during a written warning plan or for serious policy infractions. Requests for termination of employment should also be approved by Human Resources. If the termination request follows a written warning period, the supervisor should submit a Performance Summary document from Human Resources. The performance summary includes the following information:

- A record of any and all conversations with the employee   regarding his/her performance or behavior
- The steps taken to address the issue or behavior
- Any progress or lack thereof on the part of the employee
- A final recommendation from the supervisor and Human Resources

It is important to note that suspension or discharge may be an appropriate response depending on the nature and severity of the issue.

**EXCEPTIONS.** Violations of work rules, instances of unacceptable behavior or misconduct, or continued poor performance will be subject to progressive discipline. However, based on the employee's work record and the severity of the misconduct or performance issue, an escalation of the progressive discipline system may be warranted. For example, some types of misconduct are so intolerable that they may be punished by termination at the first occurrence. These include, but are not limited to, physical attacks on supervisors or co-workers; falsification of an

employment application or other work documents or records; theft; willful property damage; or use or possession of illegal drugs on the job.

112.    These express and implied promises in the City's employment Manual created a contract under which Plaintiff could not be fired at will, but rather only for cause, and then only after the procedures outlined in the Manual were followed.

*The Termination*

113.    Mayor Arrigo was inaugurated for his second term on Monday January 6, 2020. Plaintiff was terminated on Friday, January 10, 2020, solely because of her political support and affiliation with the Mayor's opponent's campaign.

114.    On the morning of January 10, 2020, the Mayor's Assistant called and asked Plaintiff, "Are you intending on coming up to the Mayor's Office?" Plaintiff responded, "Oh no, why?" The Assistant responded, "Well, didn't you get the email?" Plaintiff indicated that she had not received an email, but that she would "come right up."

115.    Plaintiff discovered that on January 9, 2020, at approximately 6:00pm, John Viarella had sent an email to Plaintiff at her work email address, informing Plaintiff that she was required to meet with the Mayor at City Hall at 8:30 in the morning.

116.    Plaintiff scurried to City Hall for her meeting. Upon arrival to the Mayor's Office, the Mayor said, "Well I guess you know why you're here." Plaintiff responded that she did not know why she had been called to his office. The Mayor them informed her that her employment was being terminated.

117.    When Plaintiff inquired as to the reason for her termination, the Mayor responded, "I am not going to tell you, and I don't have to tell you!" Even still, the Mayor, as well as the Director of Human Resources, acknowledged that Plaintiff's termination was not the result of any

misconduct or wrongdoing on her part. There was nothing communicated to the Plaintiff about being fired for cause or for poor job performance.

118.    The Mayor handed Plaintiff an Agreement for Separation and told her to sign it. Plaintiff begged the Mayor for time to review the document, but he insisted that she sign it on the spot. Plaintiff explained that her husband was sick and inquired as to how this affected her benefits. Despite Plaintiff's pleads, neither the Mayor nor the Director of Human Resources, would provide any information nor explanation to Plaintiff regarding how her benefits, particularly health benefits, would be affected. They simply pressed Plaintiff to sign the Agreement.

119.    Ultimately, Plaintiff was provided one-hour "on the dot" to sign the Agreement or the "deal was off the table," according to the Mayor. The Mayor told Plaintiff that if she just signed the Agreement, he would not interfere with her eligibility to receive unemployment benefits. The Mayor then stated, "I'm not that much of an [expletive]."

120.    On January 10, 2020, the Mayor had terminated four City employees, all of whom were known Rizzo supporters, including Plaintiff.

121.    Before the end of the day on January 10, 2020, the Mayor's office electronically disseminated a public letter to each city employee informing all of the terminations. The emailed letter was also copy furnished local newspapers.

122.    The Mayor's actions taken against Plaintiff during his term and described above and his termination of Plaintiff are reasonably likely to deter other employees from engaging in constitutionally protected speech and association.

123.    On January 16, 2020, Plaintiff sent a revocation letter to the Mayor and to the Director of Human Resources, advising them that given the circumstances under which she was required to sign the Agreement, she wished to revoke her signature. Plaintiff was later notified by telephone

message left on her voicemail from the union representative that her revocation was accepted by the Mayor.

124.    The Mayor's campaign of harassment and retaliation continued following Plaintiff's unlawful termination. On two separate occasions, the Mayor recklessly published notice of the termination to outsiders through local newspapers.

125.    On January 15, 2020, even though the Mayor had already sent letters of Plaintiff's termination to each city employee, the Mayor and/or his agents, recklessly caused for the news of Plaintiff's termination to be published in the local newspaper. The Mayor's publication was excessive and unnecessary, as well as intentionally defamatory and cruel.

126.    On January 21, 2020, Tara Vocino, a reporter for the Revere Advocate, a local newspaper, inquired with HR Director, John Viarella, "Do you know how many years each staff member served for, and what was the reasoning behind it? Was it politically motivated, or more of a personnel/job performance issue?" Viarella provided Vocino with the service dates for each of the terminated employees and advised her, "with regard to the rationale you will have to contact the Mayor's office for further comment."

127.    On January 24, 2020, an article by Tara Vocino, appeared on the front page of the Revere Advocate that read, *"City Explains Reasoning Behind Four Terminations."* According to "the Mayor's spokesperson, Chief of Staff Robert Marra said the move is not politically motivated contrary to rumors on social media…the terminations were related to job performance…" This defamatory statement made by the Mayor through Marra, insinuated that Plaintiff had done something wrong – that she had been terminated for cause-- and the reason provided, for all the world to read, was that it was "related to job performance."

128.    The January 24, 2020 publication was unnecessary and excessive, and the statement made by the Mayor through his agent, was made with knowledge of its falsity. The statement was negligently, recklessly, and intentionally published in a manner equaling malice and abuse of any alleged conditional privilege (which Plaintiff denies existed).  The statements were, in fact, made with ill will, and an intent to vex, harass, annoy, and injure Plaintiff in order to justify the illegal actions of the Defendants, and to cause further damage to Plaintiff's professional and personal reputation. Moreover, the Mayor's actions, in widely disseminating news of the terminations, were to serve as a warning to other employees; a reinforcement of his messages to all employees that "If you are not with me, you are against me."

129.    Defendants' defamatory statements against Plaintiff referenced above are untrue.

130.    On numerous occasions, Plaintiff was approached (and continues to be approached) - at the supermarket, at church, or the bank – by residents of the City, some of whom she had come to know and others with whom she was not familiar.  Many had acknowledged that they had read the newspaper articles, and inquired Plaintiff with what she done to get fired.

## CLAIMS FOR RELIEF AND DAMAGES

### COUNT I
### FIRST AMENDMENT POLITICAL RETALIATION, 42 U.S.C. § 1983

131.    Plaintiff incorporates by this reference the allegations contained in paragraphs 1 through 130 above.

132.    Defendants violated the provisions of 42 U.S.C. 1983, in that Defendants, acting under color of State law, deprived Plaintiff of the privileges and immunities secured to her by the First and Fourteenth Amendments of the United States Constitution and, in particular, her right to hold

employment without infringement of her First Amendment rights to freedom of speech and freedom of association.

133.    Defendants intentionally, willfully, and recklessly terminated Plaintiff in order to deny Plaintiff her First Amendment right to freedom of speech and freedom of association.

134.    Defendants actions were to penalize and retaliate against Plaintiff for her exercise of fundamental First Amendment rights.

135.    The actions of the Defendant are a violation of the First and Fourteenth Amendments to the United States Constitution for which the Plaintiff suffered lost pay and benefits, and suffered emotional distress, for which she seeks compensation.

**COUNT II**
**DEFAMATION**

136.    The Plaintiff incorporates by this reference the allegations contained in paragraphs 1 through 135 above.

137.    Plaintiff is informed and believes Defendants, by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally cause external statements of defamation, of and concerning Plaintiff, to third persons and to the community. These false and defamatory statements included express and implied statements that portrayed Plaintiff as a person who had poorly performed her job and had done something wrong and as a result of such wrongdoing had been fired, when the reality was that Plaintiff had been an exemplary employee and was fired because she supported the Mayor's political opponent.

138.    The Defendants' false statements were read by countless other persons in Plaintiff's hometown and neighboring towns.

139.    As a proximate result of the publications and republication of these statements by the Defendants, Plaintiff has suffered injury to her personal and professional reputation, including

suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment and employability, and significant economic loss in the form of lost wages, future earnings, and benefits, all to Plaintiff's economic, emotional, and general damage in an amount to be determined at trial.

140.    Defendants statements were and are not privileged because they were made by defendants with malice, hatred, and ill will toward Plaintiff and with the ultimate desire to injure Plaintiff and destroy her reputation. Therefore, no privilege existed to protect any of the Defendants from liability for any of these aforementioned statements.

141.    Defendants false statements concerning Plaintiff were made with actual malice intending to and causing significant harm to Plaintiff.

**COUNT III**
**BREACH OF CONTRACT**

142.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 141 above.

143.    The City's Employment Manual imposed a contractual obligation on the City to follow the progressive discipline policies described therein.

144.    The City breached its express and implied contract by terminating Plaintiff without following the progressive discipline policies outlined in the City's Employee Manual.

145.    Plaintiff suffered damages as a result of the breach.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

146.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 145 above.

147.     The Defendants intended to inflict emotional distress or should have known that emotional distress was the likely result of their conduct.

148.     The Defendants' conduct was extreme and outrageous.

149.     The Defendants' conduct was the direct cause of Plaintiff's distress.

150.     The emotional distress sustained by the Plaintiff was severe.

151.     The acts described herein constitute outrageous conduct against the Plaintiff.

152.     The Defendants' intended to cause Plaintiff emotional distress, or, in the alternative, Defendant and/or his agents engaged in conduct with reckless disregard of the high probability of causing Plaintiff to suffer emotional distress.

153.     Plaintiff suffered severe emotional distress of a nature that no reasonable person could be expected to endure.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1.  Enter judgment in Plaintiff's favor on all claims for relief;

2.  Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983;

3.  Award full compensatory damages to Plaintiff, including but not limited to, damages for all loss of wages and benefits incurred as a result of her unlawful termination;

4.  Award full compensatory damages to Plaintiff, including but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Plaintiff suffered and is reasonably certain to suffer;

5.  Award punitive and exemplary damages for the Defendants' intentional, malicious, and egregious acts and callous and reckless disregard of Plaintiff's constitutional rights;

6.  Award pre- and post-judgment interest at the highest lawful rate;

7.  Award Plaintiff her reasonable attorneys' fees and all other costs of suit;

8.  Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just or proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues within this Complaint.

RESPECTFULLY SUBMITTED,
Jannine Ellis
By her attorney,

## */s/ Kenneth J. DeMoura*

Kenneth DeMoura, BBO# 548910
DeMoura|Smith, LLP
607 North Avenue, Suite F
Wakefield, MA 01880
Telephone: 781-914-3777
Facsimile: 781-914-3780
kdemoura@demourasmith.com

DATED: March 12, 2021